IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 18, 2017 at Knoxville

## STATE OF TENNESSEE v. JOSE DIMAS ALVARADO

**Appeal from the Criminal Court for Davidson County**
**No. 2014-C-2531       Steve Dozier, Judge**

---

### No. M2016-00378-CCA-R3-CD

---

The Defendant, Jose Dimas Alvarado, appeals as of right from his conviction for aggravated sexual battery. See Tenn. Code Ann. § 39-13-504. The Defendant argues (1) that the trial court erred in admitting the victim's forensic interview as substantive evidence; (2) that the trial court erred in allowing the State to present evidence and argument that the Defendant had characteristics typical of perpetrators of child sexual abuse; (3) that the trial court erred in allowing the prosecutor to make improper statements during closing argument that referenced facts outside the record and shifted the burden of proof to the Defendant; (4) that the trial court erred in instructing the jury on aggravated sexual battery as a lesser-included offense of rape of a child; and (5) that the trial court imposed an excessive sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

C. Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Georgia Simms and Daniel Satterfield, Assistant Public Defenders (at trial), for the Defendant, Jose Dimas Alvarado.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Alyssa Henning, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

On September 26, 2014, the Davidson County Grand Jury indicted the Defendant for one count of rape of a child, involving the eleven-year-old victim, M.A.[1] On July 16, 2015, the trial court held a hearing on the State's intent to use a recording of a forensic interview.

*Pre-Trial Hearing*

The trial court held a pre-trial hearing to determine the admissibility of a video recording of the victim's forensic interview. At the hearing, counsel for the defense requested that if the forensic interview was generally admissible, the court order the State to redact ten specific portions of the interview. The trial court subsequently found that the video recording of the forensic interview complied with the requirements of Tennessee Code Annotated section 24-7-123. The trial court granted the State's motion to use the recording as substantive evidence at trial, subject to two redactions. The court reasoned that two statements made by the interviewer, Barbara Tallent, were "overly prejudicial and barred by Rule 403 of the Tennessee Rules of Evidence." The following two statements were redacted:

1. 34:33-34:41- Ms. Tallent: "That's a lot to worry about. You had a lot of things to think about."

2. 36:41-36:50- Ms. Tallent: "That's a lot of pressure on you and I'm really sorry that you've been carrying that around. He had no right to do that."

*Jury Trial*

The Defendant's jury trial began on July 20, 2015. The victim testified that he was thirteen years old at the time of the trial. He lived in Nashville with his parents and his six siblings. The victim identified the Defendant and said that he knew him from attending the same church. The victim agreed that something happened with the Defendant one evening during a church service, but he did not remember the exact date. The victim explained that he was attending an all-night service at his church that began at 7:00 p.m. and lasted until 6:00 a.m. the next morning. The victim stated that there was a break in the service, and the attendees shared a meal. The victim said that following the

---

[1] It is the policy of this court to protect the identity of minor victims. Therefore, we will use initials for each minor involved in this case. In furtherance of this policy, we will also use initials for relatives and family members of the victim.

meal, the Defendant asked the victim to help him carry leftover food to his car. The victim agreed and accompanied the Defendant to a dark area of the parking lot.

The victim testified that he was alone with the Defendant and that he had told no one where he was going. The victim said that he knew the Defendant and had talked to him at church prior to this night. When asked what happened when he and the Defendant reached the car, the victim replied,

> And then [the Defendant] told me to get in the car and so I did, right. And like I was scared and then he told me to climb into the back of the car and then he went to like the driver's seat, the driver's seat and then he got in and he locked all of the doors and then he got in and he locked the driver's seat door and I went to the very back because he told me to go there. And then he went to the back when I went to the back, he told me to take my clothes off. And I was really scared and like I didn't know what to do so I just did what he said and I did, right.
>
> And [the Defendant] was taking his clothes off. I was trying to find a way out. Like, I was trying to see if like the back door was open or something, it wasn't. I was scared. My heart was beating really fast. I remember he told me to make sure nobody [was] watching or nobody [was] – or like if nobody [was] nearby and I was like just hoping someone would be there.

The victim said that he did not see anyone nearby because it was dark, and it was dark where the Defendant's car was parked. The victim testified that the Defendant's car was red and that it contained "the driver's seat, the passenger [seat,] and three seats for like three people in the back, and then [there was] the very back part where you would like store stuff and it was like a bunch of space." The victim agreed that the three seats in the back were in one row and that this row of seats connected with the back part of the car so that there was not a separate trunk area. The victim asserted that he had not been in the Defendant's car before this evening. When asked what happened after the victim had taken off his clothes and the Defendant had removed his own pants, the victim said that the Defendant instructed him "to turn around and to like bend over." The victim said that he did this and then "remember[ed] just feeling a horrible pain" "in [his] rear end." Counsel for the State showed the victim two diagrams of a boy, and the victim circled the area he was referring to as his "rear end." When asked if he knew what was causing the pain, the victim replied, "It was [the Defendant's] private part" and that the Defendant's "private part" was "[i]nside" his anus. Counsel for the State showed the victim a diagram of a man and asked the victim to circle what he was referring to as the Defendant's private part. The victim then identified the penis on the diagram.

-3-

The victim testified that after he felt the pain, the Defendant "took it out and he was cleaning something." When asked what the Defendant was cleaning, the victim said, "It was my rear end, but I don't know what it was" that the Defendant was cleaning off. The victim explained that the Defendant used "his undershirt, like a white one he had" to clean. The victim said that after cleaning, the Defendant "rolled [the shirt] up and . . . put it outside." He said that after that, the Defendant told the victim to "pull up [his] pants and to get dressed." The victim said that he got dressed and that the Defendant got dressed, too. He said that the Defendant put on a different shirt from the one he used to clean and instructed the victim not to "tell anybody." The victim testified that he returned to the church and did not tell anyone about what had happened because he "felt scared."

The victim agreed that at some point he did tell someone what happened that night. He said that several months after the incident he told his mother. When asked how it came about that the victim told her, he said, "I tried to do something horrible to my brother." He asserted that she "walked in on" the victim trying to "do what happened to [him] to [his brother]." The victim said that his mother walked in "before it happened[,]" and "a day after" he told her what the Defendant did to him. Counsel for the State asked the victim what he remembered about that conversation and he responded,

> It was a question like: She told me, like has something happened to you that you're not – you're not the same person no more and like, and like spending time with the family. And she just kept asking me and she was like has someone done anything to you or has something done something – like touched you or something. Like you can tell me. And I was like, no. Like I told her several times, like no, and she was just like mentioning names of people and she asked me again she was like, has someone done something to you? And I was like yes. And then she was mentioning names and then it came up to [the Defendant's] name and I told her it was him. And that's what I told her.

The victim said that the Defendant's name was not the first name his mother mentioned. The victim agreed that counsel for the State had shown him "a video of [the victim] talking to a woman named Barbara [Tallent] about what happened." The victim agreed that the woman in the video interviewed him about the incident with the Defendant, he identified a disc containing the interview that he had previously initialed, and he asserted that he told the truth during that interview. The disc containing the forensic interview was entered into evidence and marked as Exhibit 3.

On cross-examination, the victim was asked about several details from the night of the incident with the Defendant. The victim agreed that he remembered the Defendant's

-4-

having a red car, and he confirmed that he did not remember the exact date that this happened. The victim said that "it was warm" outside, and when counsel for the defense asked if it was summertime, the victim said, "I guess, yeah." He confirmed that his church had all-night vigils at approximately "the end of every month[,]" and he agreed that he "remember[ed] this happening [during] one of the summertime" vigils. The victim was then asked if he remembered telling Officer Timothy Miller that the Defendant "tried to kiss [him] on the mouth[,]" and the victim replied, "I don't remember saying that." The victim agreed that he did not tell Ms. Tallent that the Defendant tried to kiss him on the mouth.

Dr. Verena Brown testified as an expert in child abuse pediatrics and in the field of forensic examinations. Dr. Brown said that she was employed with Vanderbilt and several times a month worked with Our Kids Clinic, which specialized in child sexual abuse. Dr. Brown explained the standard procedure for when she sees a child in conjunction with Our Kids Clinic:

> [E]very child that we see in our program gets seen primarily or initially by a social worker that will take the history from the parents of what the allegations are. And then at that point, they will tell the clinician. So in my case, if it's my client, they will tell me what the allegations are, so when I examine the child, I know what sort of things I'm looking for.

> And then I will go into the room and talk to the parents or caretakers about their medical history specifically. Meanwhile, if the child is old enough to speak, the social worker will be talking with the child. After that, we will do the physical exam.

Dr. Brown further explained that the parent and the child are interviewed separately.

Regarding the victim in this case, Dr. Brown testified that she performed an exam on the victim in February 2014. She identified the "Our Kids report" on the victim as a report generated by her and a social worker for Our Kids Clinic. She said that it contained "the history that [the victim] gave and the documentation that this was a full exam." Dr. Brown read the medical history contained in the report, which included the following:

> When asked to tell [Dr. Brown] what occurred at church, [the victim] reported, it was like October last year and that his family was attending the church service that began at 7:00 p.m. and ended at 6:00 a.m. He state[d] that they were eating and that he was sitting next to a man he knew from church. He state[d] – quotes, this man was really kind to me, he gave me candy. He state[d] that the man told him to take the leftover food

-5-

and put it in his car. [The victim] said okay and began walking toward the car, but it was dark and he became scared. He state[d] that he decided he was not going to take the food to the car and turned around. He state[d] as he turned around, the man was coming toward him and he told him to put the food in the car. [The victim] state[d] he told the man quote I am not going to go, I am scared end quote. But that the man continued to tell him to go to the car.

[The victim] stated that when they got to the car, the man told him to get in and asked – and he asked why. He state[d] that the man kept telling him to get in and they both got in the car and the man locked the door. [The victim] stated the man told him to pull down his pants and kept repeating, quote make sure nobody come[s], end quote.

[The victim] stated, quote I was paralyzed, end quote. He state[d] he became concerned that the man had a gun and that he did everything the man told him to do because he did not know what could happen to him. When asked what happened after the man pulled down his pants, [the victim] state[d] that the man pulled down his pants and told him to bend over. When asked what happened next, [the victim] stated quote he put his private part in my butt, end quote. He state[d] that he was crying because quote it hurt so bad, end quote. He state[d] the man kept telling him not to make a sound and that the man continued to put it in his butt and then he quote took off his shirt and he cleaned himself off and cleaned me off, end quote.

When asked if he had seen the man put anything on his penis, [the victim] said no. [The victim] also stated that he did not know what a condom was. When asked if he saw anything come out of the man's penis, [the victim] said he did not know. When asked what he had cleaned off, [the victim] said he did not know, but that the man told him that he was going to clean his butt and clean himself.

[The victim] told him at that point the man told him quote you better not tell anybody, end quote. He said he became concerned that the man might hurt him or his family. [The victim] state[d] that the man then told him to quote/unquote get out of the car. [The victim] state[d] that he [was] not sure where the man went for the rest of the night, but that he does not remember seeing him.

When asked if something like this had ever happened before, [the victim] said no. When asked if it happened after this, he said no. [The victim] stated that on another occasion while he was playing outside with his friends – he th[ought] this occurred in November – the man kept calling him, quote, [M.A.] come, [M.A. come], end quote. But that he ignored him. With regard to any previous sexual abuse, [the victim] denies any.

When asked if there was any other contact during the incident, [the victim] said no. When asked if there was anything else he needed to share, [the victim] stated no.

Dr. Brown testified that the medical exam was normal, aside from a "little fissure or a little opening of skin at the 12 o'clock position of the anus." She explained that this could be caused by "sexual abuse" or from "passing a large stool or something of that nature." She said that the exam was "four months after the incident, so it's unlikely [the fissure] was due to th[e] incident" involving the Defendant. When asked if she would "expect to find an injury after an incident like the one that [the victim] disclosed[,]" she responded, "Certainly not four months later. In fact, it's actually unusual to find any sort of injury at all after such a disclosure." She further explained that "the anus heals very, very quickly. And so it's very[,] very normal to have a normal exam, especially [four] months later." She said that a rape kit was not collected due to the passage of time. She said that a standard time to collect a rape kit from a child was "within three days of an assault" because "[t]hat's when you are likely to find evidence of DNA." She confirmed that it was "possible for a child to be anally penetrated and there be no medical findings."

On cross-examination, Dr. Brown confirmed that "only one act of penetration" was disclosed by the victim and that she was not "looking for any other type of sexual conduct during that exam." Dr. Brown also agreed that according to her information, the "act of penetration occurred in October of 2013." Dr. Brown agreed that during the exam, she found no signs of "chronic trauma" and that she did not consider the "anal fissure either a sign of acute trauma or chronic trauma."

O.A. testified that she lived in Nashville with her husband and family and that the victim was her son. She identified the Defendant and stated that she knew him because he attended "the same church [she and her family] used to" attend. When asked how long she had known the Defendant, she said "[m]ore than [fifteen] years[.]" She explained that she "did not remember the exact year that he was there[,]" but the Defendant had lived "on the other side" of the duplex that she and her family rented. She said that he lived there "maybe [two], [three] years." She confirmed that the victim knew the Defendant through church and said that "[s]ometimes . . . [fifty], sometimes [forty]" people attended their church. She agreed that the largest number of church attendees was

-7-

"80" but explained that not "everybody goes" "every day[.]"  She agreed that the victim was "around the [D]efendant at church and church related activities."  O.A. confirmed that on January 16, 2014, she observed her son "exhibiting some odd behavior."  She said that she saw the victim doing "something suspicious" to another one of her sons, J.A. She asked J.A. if the victim had done anything to him, and she said that J.A. responded, "[N]o, he just tried to touch my underwear."

O.A. said that the next day, she told her nineteen-year-old daughter about the situation, and her daughter told her "somebody is doing that to him.  So you need to ask him."  O.A. said that she decided to talk to the victim and asked him,

> Why did you try to do this to J.A. to try to . . . pull his pants down? So I said to him, is there someone doing that to you?

> So he [was] just turning to look at me.  And I kept saying is there somebody doing this to you?  And I told him, you have to tell me the truth. And he just kept looking at me and crying.  And I said . . . tell me who it is. Is it someone from school, is it a teacher?  He said no.  And I said is [it] someone here at home?  I said is it one of your uncles?  He said no.  And I said then who?  And then I said, where, at church?  And he said yes.  And I said who?  Who?  And he said [the Defendant].

She explained that the victim did not give her any specifics, but that he "just kept crying." O.A. called her husband and told him "what [she] had discovered."  She said that her husband called an elder from their church, Ignacio Perez.  Mr. Perez came to their home and spoke with the victim and his parents.  O.A. stated that he encouraged them to "not stay quiet" and "to report this to the police."

O.A. explained that the following day, she called the victim's pediatrician, Dr. Carson.  She said that Dr. Carson returned her call, and O.A. told her what happened with the victim.  She said that the doctor referred her "to a counselor to tell [her] what [she] should do."  O.A. said that she talked to this counselor, who told her that she "needed to report [the incident] to [the] police."  O.A. said that after speaking with the counselor on Monday afternoon, she called the police immediately.  She said that the police and a detective came to her home and that she took the victim to see a doctor "the next day or two days after."

When asked if she had noticed anything regarding the victim's behavior about attending church before the victim told her about the incident, she said, "Sometimes [the victim] didn't want to go.  And I would tell him go, to go with [his] dad and go to the church.  He [would] say no, I don't want to go, and I would insist that he should go."  She

-8-

said that this behavior started about six months before the victim told her what had happened with the Defendant.

On cross-examination, O.A. said that the vigils at her church occurred at the end of every month. She explained that many people attended, and during a break in the service, it was common for adult church members and the children to go outside and play for about thirty minutes. O.A. confirmed that during these services, she had not seen "anything strange between [the Defendant] and [the victim]." She also agreed that she had seen no physical signs of abuse on the victim; however, she said that he was "more quiet and sad and lonely" during the months leading up to January 2014.

J.F.A.C. testified that he was married to O.A. and that the victim was their son. He explained that he lived with his family in Nashville and that their home was divided into two units. J.F.A.C. stated that his family lived in one unit and that they rented out the second unit. J.F.A.C. identified the Defendant and said that he met him at a church in Nashville in 1997 or 1998. He explained that the Defendant rented the second unit of their home in either 2007 or 2008 and that he remained there for a "year and a half or two years."

J.F.A.C. recalled that on January 17, 2014, his wife called him while he was at work and informed him that the Defendant had been abusing the victim at the church. J.F.A.C. said that he went home and called Mr. Perez and that Mr. Perez came to his home and spoke with J.F.A.C., O.A., and the victim. J.F.A.C. explained that they took the victim to a clinic and then called the police at the suggestion of personnel at the clinic. He said that an officer came to their home. He said he and his wife took the victim to see a physician and that they took "him to a place where they d[id] therapy." Regarding the specifics of the incident involving the Defendant, J.F.A.C. said that he "tried many times to talk to [the victim], but he never wanted to tell [J.F.A.C.] specifically anything." He said that the victim met with many people regarding the incident including treatment providers and the District Attorney. He testified that either he or his wife took the victim to these meetings. He explained that when the victim met with a therapist, neither he nor his wife were in the room because "it [was] treatment just treatment between . . . that person and [the victim.]"

J.F.A.C. explained that prior to the victim's allegations, his relationship with the Defendant was "very good." When asked to explain his family's relationship with the Defendant, he responded, "Spiritually speaking, it was a relationship through the church. It was a spiritual relationship that [grew]." He said that as a member of the church, the victim spent time with the Defendant. He agreed that the church regularly held nighttime vigils and that both the victim and the Defendant attended these services.

J.F.A.C. also testified that he placed a telephone call to the Defendant that was recorded for the police. He explained that a detective set up the recorded call and remained with J.F.A.C. while he spoke to the Defendant. J.F.A.C. said that he and the Defendant spoke Spanish during the call. He said that he called the Defendant to discuss the incident with the victim. J.F.A.C. said that he asked the Defendant if he attacked the victim and that the conversation lasted approximately twenty to thirty minutes. When asked about his impression after the telephone call, J.F.A.C. said, "At the end of the call, after making so many questions for him to tell me, he told me that, yes . . . that he had done it and that if that would make me feel better, he accepted that he did that."

On cross-examination, J.F.A.C. confirmed that he spoke with the church elder, Mr. Perez. He agreed that two days later he took the victim to a clinic and called the police after speaking with a doctor. J.F.A.C. said that after he called the police, Officer Miller came to his home and spoke with him and his family in English. He agreed that he translated some of Officer Miller's questions for O.A. He said that after speaking with the family together, Officer Miller spoke with the victim separately in a different room. J.F.A.C. agreed that after the victim told his parents about the incident with the Defendant, he and his family quit attending the church. He also confirmed that "if [he] had known anything was wrong before [the victim] told [him] about this, [he] would have quit going to church a long time before that."

J.F.A.C. was also questioned about the overnight vigils at the church. He agreed that the vigil would last from 6:00 p.m. to 6:00 a.m. He confirmed that he did not remember "any service where [the victim] disappeared." However, he explained that it was "very hard to tell because [he] was an elder in the church and [he] would be focused on working on what was needed for the service of the church." J.F.A.C. agreed that he did not observe the victim and the Defendant leave the church together, but he said that he did see something "strange happen between [the victim] and [the Defendant]." J.F.A.C. explained that the Defendant "was very friendly with children. He would buy them candy."

When asked about the recorded telephone conversation with the Defendant, J.F.A.C. agreed that throughout the discussion, the Defendant told him "no, no, no, . . . this did not happen." He said that it was at the end of the conversation when the Defendant told J.F.A.C. that he had touched the victim and "accept[ed] the situation."

On re-direct examination, J.F.A.C. testified that the children of the church liked the Defendant. He claimed that when the Defendant "would walk into the church, the children would follow him." When asked "isn't it correct that also being active in the church the [D]efendant would go on trips with other members of the church, including children, members of the church, isn't that correct?" he replied, "Yes, it's true."

-10-

Sergeant John Farrell testified that he was employed as a detective in the sex crimes unit of the Metropolitan Nashville Police Department (MNPD) in January 2014. He identified the Defendant and agreed that he conducted an investigation into "allegations of child sexual abuse involving the [D]efendant." He explained that during such an investigation, it was not typical for a responding officer to interview children who made allegations of sexual abuse because they were not trained to do so. Sergeant Farrell said that he responded to the scene in this case but that he did not interview the victim.

He explained that the protocol for this type of situation was as follows:

> [W]hen a child makes a . . . disclosure of sexual abuse to, say, a parent or some type of guardian, and/or whoever, a teacher maybe, they might call the police or notify [the Department of Children's Services (DCS)]. Once we get the information, we will go usually speak to the person or people that that child disclosed that information to. In the meantime, we will be in contact with DCS. And usually DCS or sometimes our unit will set up what we call a forensic interview to have that child interviewed at what we call a child advocacy center. So that's kind of how the child gets interviewed and you know the interviewers at the child advocacy center are highly trained to do this type of interview.

He explained that the interviewers at the child advocacy center are trained differently than patrol officers and said that "they go through many courses to learn how to do this. This is what they do day in and day out." Sergeant Farrell stated that another reason he did not interview the victim when he responded to the scene was because the officers tried "to keep the amount of interviews of the victim to a minimum."

Sergeant Farrell said that when he arrived at the family's home, he was not the first officer to respond to the scene. He explained that when he arrived, he spoke to the patrol officer to determine "what was going on and what the allegations were." He said that he spoke to the parents of the victim. Sergeant Farrell explained that he spoke in English with the parents and that the victim's father "communicate[d] pretty well" and was "interpreting what [the victim's mother] was saying." He confirmed that there was no official translator on the scene.

Sergeant Farrell agreed that he suggested that the victim's father assist him in obtaining a recorded telephone conversation with the Defendant. He explained that "[the victim's father called the [Defendant] . . . on the telephone. And basically talked to him about these allegations. While speaking with him, we record[ed] the call in hopes of gaining some sort of confession or admission." Sergeant Farrell said that he encouraged

-11-

J.F.A.C. to "tell [the Defendant] that [J.F.A.C.] knew about these allegations and . . . confront him about it and ask him to explain himself[.]" He said that J.F.A.C. agreed and that the recorded telephone conversation occurred in Spanish. Sergeant Farrell testified that he did not speak Spanish, so he was not able to understand the conversation as it was taking place. However, he said that during the telephone call, he observed that J.F.A.C. was "upset and emotional" and "at one point he may have been crying." He agreed that he gave J.F.A.C. directions regarding the recorded conversation before the telephone call took place and that he did not give directions throughout the telephone conversation. On cross-examination, Sergeant Farrell agreed that he sent the "recorded [tele]phone call to other officers for interpretation" because he did not speak Spanish. A transcript of the English translation of the conversation was entered into evidence, and it was read individually by all of the jury members.

Sergeant Farrell agreed that he became aware during an interview that the victim made a disclosure about "the [D]efendant[']s using some sort of shirt to clean [the victim] and himself." He testified that he did not execute a search warrant during his investigation to collect this shirt or other evidence because the incident had occurred several months before the victim made a disclosure. He said that it was not likely officers would find "specific DNA like spermatozoa." Sergeant Farrell also said that when evidence is "a clothing item," "it can [be] easily laundered. And generally speaking people wash their clothes."

Barbara Tallent testified that she was a forensic interviewer at the Nashville Children's Alliance. She explained that the Nashville Children's Alliance was "a nonprofit agency in Davidson County where a CPIT [child protective investigative team] meets." She said that it was where meetings were held for "all [who were] involved in investigating and follow-up, and prosecution, and treatment and therapy, play therapy, things like that." When asked about the protocol for interviewing a child, she explained,

> It's neutral if we are not trying to – that we ask non-leading questions. Non suggestive questions. It [had] a lot of open-ended questions. We have to take into consideration the child's age and developmental abilities as well as any kind of special things that might need to be addressed or taken into consideration. And we are trained in how to follow that – it's . . . structure[d] but it's flexible and there are a lot of step[s] that we follow that we have the [flexibility] to kind[] of move those steps around a little bit.

She further explained that the purpose of the interview was not "to create a scenario" but to "listen an[d] ask the right questions so that a child is able to tell information" or "give

-12-

a disclosure regarding abuse[.]" Ms. Tallent confirmed that the Nashville Children's Alliance strictly followed protocols.

Ms. Tallent agreed that she interviewed the victim in this case at the Nashville Children's Alliance. The State played a redacted version of the video recording of this interview for the jury. In response to questions from Ms. Tallent, the victim explained that the Defendant "raped" him and that is why he was at the Nashville Children's Alliance speaking with Ms. Tallent. The victim explained that during an all-night church service, the Defendant asked the victim to accompany him to help load food into his car. The victim told Ms. Tallent that it was very dark outside in the parking lot and there were very few lights. He said that the Defendant's car was red. Ms. Tallent asked the victim if it was warm outside that evening, and he said that "it was summertime." The victim said that he became frightened and "tried to run away, but the Defendant stopped" him. He explained that the Defendant told him to get in the car. The Defendant got in the car also and "locked all the doors from the inside." The victim said that the Defendant instructed him to "take his pants down" and then the Defendant "stuck his thing in my butt." The victim said that the Defendant's "thing was his private part." The victim explained that it "hurt a lot" and he "felt something wet and weird on his skin." The victim said that the Defendant took off his shirt and used it to clean the victim. The victim stated that the Defendant instructed him not to tell anyone and that he was "scared and embarrassed and worried that something bad might happen to his family." The victim explained that the Defendant instructed him to "get out of the car" and that the victim "got out and ran really fast back into the church and acted like nothing had happened." The victim said that he did not tell anyone about the incident because he was afraid but that be eventually told his mother after she "repeatedly asked him if something had happened to him."

Counsel for the Defendant called Officer Timothy Miller, who testified that he worked with the MNPD. When asked to describe how he was trained to conduct preliminary investigations, he responded, "[F]irst of all, make sure the scene you are going to is safe, identify who is the victim, who is the suspect. Identify any witnesses, try to separate parties . . . , [obtain] individual statements." Officer Miller explained that he was trained to do "field site crime scene interviews" and said that these interviews were for the purpose of "gather[ing] pertinent information" but were not the same as "advance[d] interviewing" done by "a detective[.]" He confirmed that he took notes during preliminary interviews and then completed a report that included "what the victim told [him] . . . victims, witnesses, any other suspects[,] pertinent information or people[,]" and parents if [the victim is] a juvenile[.]" He also included "a synopsis of what the victim told" him.

Officer Miller testified that on January 11, 2014, he went to the victim's home to "investigate[] the alleged rape" of the victim. He said that after arriving at the home, he

spoke with the victim and his father. Officer Miller explained that because the victim was a juvenile, he "tried to speak mainly to his father, but [the victim] was there and [Officer Miller] did have interaction with both [the victim and his father] at the same time." When asked if the victim told him anything about the Defendant's "trying to kiss" the victim, Officer Miller replied, "According to the report, [the Defendant] began trying to kiss [the victim] on the mouth and [the victim] struggled to stop him based on [the victim's] statements."

On cross-examination by the State, Officer Miller confirmed that he was a patrol officer and routinely responded to 911 calls. He agreed that on January 11, 2014, responding to the call regarding the victim "was more than likely one of many calls that [he] responded to as part of [his] shift[.]" Officer Miller agreed that after leaving the scene at the victim's home, he "never had anything else to do with this case." He also confirmed that when he took notes at a scene during an interview, he was "not actually putting that information into the report at that time." He confirmed that he "would go later and put that information into [his] report" and that "sometimes mistakes are made when [he was] inputting information into an incident report." Officer Miller agreed that the likelihood of his making a mistake increased if he was "speaking to more than one individual." He agreed that he spoke with the victim and J.F.A.C. on the front porch of their family home and that he became aware that J.F.A.C.'s first language was not English. Officer Miller confirmed that he did not speak Spanish but agreed that he was able to successfully communicate with J.F.A.C. He agreed that at some points during the conversation, both the victim and J.F.A.C. would speak simultaneously. Regarding his police report, Officer Miller assented that "some of the statements that [he] wrote down where [he] would start with [the victim] stated blank could have been information that the father . . . gave to [him] that [he] then wrote down as [the victim] stated[.]" Officer Miller agreed that he did not record the interview with the victim and J.F.A.C. and that he did not record direct quotations in his police report.

On redirect examination, defense counsel asked Officer Miller the following questions:

> Q. The District Attorney asked you or was saying that you were using [the victim's father] and [the victim] interchangeably[.] [I]f we look at your report on page four of that report, the second full paragraph, eight lines down from the top, I want to make sure I'm saying this right, you wrote, [the victim] stated that [the Defendant] asked him to go outside the church and retrieve something from [the Defendant's] vehicle, stop, did I read that correctly?
>
> A. Yes.

Q.      [T]hen on the third paragraph you wrote according to [the victim's] statements about the incident, [the Defendant] began trying to kiss him on the mouth while he struggled to stop him, did I read that correctly?

A.      Yes.

Q.      And finally in the [fourth] paragraph, you wrote: [the victim] stated, he and [the Defendant] went back inside the church after the incident, did I read that correctly?

A.      Yes.

At the conclusion of the trial, the jury convicted the Defendant of the lesser-included offense of aggravated sexual battery.

*Sentencing Hearing*

After the Defendant's jury trial, the trial court conducted a sentencing hearing, which proceeded as follows. The victim testified that in addition to the incident at the church, there were other incidents involving the Defendant that made the victim feel uncomfortable. The victim explained that he went on a church trip with the Defendant and said,

> We were going to Kansas, like the whole church like in the van that they have, and like we were at the back with the other kids and [the Defendant] was back there, too. And I just remember he was like really close to me, and when he was there, he was like touching me. So I got scared, so I moved to like the front – like the one before me. And then he moved there too again. And then we came to where we were going to stop, the place where we were going[.]

When asked what part of his body the Defendant was touching, the victim responded, "My behind." The victim testified that this incident occurred before the incident at the church.

Augustine Menge testified on behalf of the Defendant. She said that she had known the Defendant since approximately 2010, when she joined the same church he attended. Ms. Menge explained that there were church services on "Mondays, Wednesdays, Fridays, Saturdays[,] and Sundays." She said that she saw the Defendant "in church and [her] husband and [the Defendant] would work together." She said that she and her husband "visit[ed] him in his house" and saw him "very often." When asked about the Defendant's reputation at work, Ms. Menge replied, "Everybody really loves

-15-

him." Ms. Menge testified that the Defendant was "very responsible" and that he often volunteered to drive for church road trips. She explained that she and her husband had children who went on these trips and that other children from the church went on these trips. When asked why the Defendant was often asked to drive on these trips, Ms. Menge said, "Because we [were] aware of his ability of driving long distances and he [was] also very capable and responsible[.]" She further explained that the church van held fifteen people and that "there were children in this van, so [church members] really want[ed] to confide in somebody who could actually get [them] there safely and bring [them] back safely." Ms. Menge testified that the Defendant was "very good with [her] kids."

Salvador Perez testified that he first met the Defendant in El Salvador when Mr. Perez "was about 18 years old." Mr. Perez testified that the Defendant moved to Nashville in 2000. He explained that he knew the Defendant to be "a very good person." Mr. Perez said that after the Defendant moved to Nashville, "[h]e [was] a very hardworking person. He [was] very dedicated, [was] always working. And he [had] worked in several different fields." Mr. Perez testified that the Defendant had three daughters who lived in El Salvador and were approximately ages twenty, eighteen, and seventeen. When asked what kind of father the Defendant was, Mr. Perez replied, "He ha[d] been a very good father. He [was] very responsible and very hardworking for his children." Mr. Perez agreed that the Defendant sent his daughters money and that "[h]e always communicated with his children and he help[ed] his parents because they [were] elderly[.]" Mr. Perez concluded that he knew the Defendant as "an excellent person" and that he helped "anybody who [had] ever come to him for help[.]"

Mario Hernandez testified that he is the Defendant's brother. He said that after coming to the United States, the Defendant worked in construction and "was a good worker." He said that the Defendant had a "very good" relationship with the community. When asked what kind of brother the Defendant was, Mr. Hernandez replied that he was "very good." Mr. Hernandez agreed that the Defendant had a family and was "a good father." He explained that the Defendant had three daughters living in El Salvador and that the Defendant had "always been responsible" as a father. Mr. Hernandez testified that "one of [the daughters was] studying and she had to stop her studies due to the lack of financial support from her father" after he was arrested.

After the final witness testified, counsel for the Defendant also asked the trial court to take note that several members of the Defendant's church-family and friends were present to offer their support. At the conclusion of the sentencing hearing, the trial court sentenced the Defendant to serve an eleven-year sentence at one hundred percent with the Tennessee Department of Correction.

The Defendant filed a motion for a judgment of acquittal and a motion for a new trial. The trail court denied both motions, and the Defendant filed a timely appeal with this court.

## ANALYSIS

### I. Forensic Interview

The Defendant argues that the trial court erred in admitting the video recording of the forensic interview as substantive evidence. First, the Defendant contends that the video recording was not generally admissible pursuant to Tennessee Code Annotated section 24-7-123 and "that the trial court abused its discretion in admitting the recording in this case because it improperly bolstered the testimony of the alleged victim." The Defendant asserts that the interview "served only to bolster the testimony of the alleged victim[] and created the danger of allowing the jury to be influenced to decide the case on the repetitive nature of the interview instead of trial testimony." The Defendant argues that neither Tennessee Code Annotated section "24-7-123 nor State v. McCoy, 459 S.W.3d 1, 10 (Tenn. 2014), support automatic admissibility of forensic interviews as substantive evidence" and contends that the trial court abused its discretion by admitting the video recording. Moreover, the Defendant argues that the video recording should have been excluded under section 24-7-123(b)(2)(K) as "any other factor deemed appropriate by the court" because the video recording improperly bolstered the victim's testimony.

Alternatively, the Defendant contends that should the video recording be generally admissible, the trial court erred in not redacting portions of the interview that were irrelevant and unduly prejudicial. The State responds that the trial court properly exercised its discretion in admitting the recording of the victim's forensic interview as substantive evidence pursuant to Tennessee Code Annotated section 24-7-123.

### A. General Admissibility

Tennessee Code Annotated section 24-7-123(a) states that

> a video recording of a child by a forensic interviewer containing a statement made by the child under thirteen years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

Tennessee Code Annotated section 24-7-123(b) provides that a video recording of a forensic interview may be admitted if:

(1) This child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross[-]examination;

(2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;

(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;

(C) The timing of the child's statement;

(D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court[.]

Id. § 24-7-123(b) (emphasis added). If the court determines that the video recording is not trustworthy, the inquiry ends, and the evidence will not be admitted. See id. § -123(b)(2). Ultimately, discretion regarding the admissibility of the evidence remains with the trial court. See id. § -123(a).

The Defendant relies on State v. Herron, 461 S.W.3d 890 (Tenn. 2015), to argue that the forensic interview was improperly admitted to bolster the victim's testimony. See id. at 904 (holding that "the trial court abused its discretion by admitting [the victim's] recorded forensic interview during her direct examination"). The victim in Herron was sixteen years old at the time of her forensic interview. In State v. Travis Smith, No. W2015-02360-CCA-R3-CD, 2017 WL 1959500, at *15 (Tenn. Crim. App. May 11, 2017), the defendant similarly argued that under State v. Herron, the trial court improperly admitted a recording of the victim's forensic interview to bolster the victim's trial testimony. However, this court held that the defendant in Smith mistakenly relied on Herron because "Herron specifically noted that [Tennessee Code Annotated section 24-7-123] did not apply because the victim in that case was above the age required by the statute at the time she was interviewed." Smith, 2017 WL 1959500, at *15. The Travis panel concluded that the victim's forensic interview was properly admitted under Tennessee Code Annotated section 24-7-123 because "the statutory requirements were met." Id.

Similarly, the Defendant in this case has mistakenly relied on Herron to support his contention that the victim's forensic interview was improperly admitted. Here, the trial court held a pre-trial hearing to determine the admissibility of the forensic interview in accordance with Tennessee Code Annotated § 24-7-123(b). The record reflects that the trial court considered this statute in making its determination regarding the admissibility of the video recording. The victim testified under oath that the video was a true and correct recording of the events, and he was subjected to cross-examination by defense counsel. See § -123(b). The forensic interviewer testified, and the trial court determined that she met the requirements of Tennessee Code Annotated section 24-7-123(b)(3). The trial court also determined that the video recording had particularized guarantees of trustworthiness. See id. § 24-7-123(b)(2). Furthermore, the Defendant does not contend that the requirements of subsection (b) were not met. We conclude that the statutory requirements are met and that the victim's forensic interview was properly admitted.

## B. Portions of Interview Not Properly Redacted

Alternatively, the Defendant argues that even if the forensic interview was generally admissible, several statements from the interview should have been redacted because they violate various Tennessee Rules of Evidence. The Defendant contends that

the following statements from the victim's forensic interview should have been redacted because they were "irrelevant and unduly prejudicial":

- [25:45-26:15] Ms. Tallent: That makes a lot of sense . . . you know that this isn't your fault. You did not do anything to deserve that. [The Defendant] shouldn't have done that and it was his bad choice, and I'm so sorry.
- [29:59-21:20] Ms. Tallent: Had [the Defendant] done anything before that made you feel funny or weird, or different?
  - Victim: "[The Defendant was] always with other men. It's really weird that he's always with this other man. It's awkward.
- [35:47-35:49] Ms. Tallent: I'm so sorry.
- [37:40-37:45] Ms. Tallent: You said your heart was pounding, which makes sense.
- [41:10-41:16] Ms. Tallent: You know that [your parents'] anger and being upset is not because of anything you've done, right? . . . It shouldn't have happened to you[,] but you didn't do anything wrong. [The Defendant] did.
- [48:11-49:03] Ms. Tallent: Do you know if [the Defendant has] done something to anyone else?
  - Victim: I don't know. . . . I heard that he used to have men over and women and do stuff to them . . . but I don't know if that's true. That's what I heard.
- [50:10-52:15]: The victim describes an incident at school involving another student in his class. He explained that the student kicked open the door to the bathroom stall that the victim was using and that the victim closed the door back and informed his teacher about the incident.

This court has held that Tennessee Code Annotated section 24-7-123

does not "remove the discretion of a trial judge in making determinations of logical or legal relevancy." State v. Mallard, 40 S.W.3d 473, 483 (Tenn. 2001). Rather, the statute provides that a recording of a forensic interview "*may* be considered for its bearing on any matter to which it is relevant...." Tenn. Code Ann. § 24-7-123(a) (emphasis added). A trial court may exclude a recording if it finds that it is not relevant to the issues at trial. Moreover, even if the video recording satisfies the statutory prerequisites in section 24-7-123, the trial court is afforded the discretion to determine that the recording is nevertheless inadmissible. See Tenn. Code Ann. § 24-7-123(b) (providing that the "video recording may be admitted")

-20-

State v. Marvin Davis, No. W2013-00656-CCA-R3CD, 2014 WL 1775529, at *8 (Tenn. Crim. App. May 1, 2014).

The general admissibility of evidence is governed by Tennessee Rules of Evidence 401 and 403. Under these rules, the trial court must determine, first, whether the evidence offered is relevant. Tenn. R. Evid. 401. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]" See Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

The Tennessee Rules of Appellate Procedure provide for harmless error review in such cases. See Tenn. R. App. P. 36(b). Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. State v. Jeff Carter, No. 2009-02399-CCA-R3-CD, 2010 WL 5343212 at *13 (Tenn. Crim. App. Dec. 16, 2010) (citing State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)). In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [wa]s correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." Id.

Here, even if the statements challenged by the Defendant were improperly admitted under the Tennessee Rules of Evidence, any error was harmless. None of the statements in the video were so prejudicial that they more probably than not affected the jury's decision making. The victim's story regarding the incident in the bathroom at

-21-

school was not relevant; however, it had nothing to do with the Defendant. Moreover, the trial court did redact two of Ms. Tallent's comments to the victim that were overly prejudicial; yet, the trial court did not find any of the statements the Defendant challenged to be overly prejudicial. Although the victim talked about other behavior by the Defendant, such behavior did not involve children, and the victim stated that he was unsure if the allegations involving others were true. Additionally, men spending time with other men has no inherent negative sexual connotation. The other statements by the interviewer were simply statements of empathy. We conclude that any error in admitting the above statements was harmless.

## II. Behavioral Characteristics Typical of Perpetrators of Sexual Abuse

The Defendant argues that the trial court erred in allowing "the State to present evidence and argument suggesting that the Defendant displayed behavioral characteristics typical of perpetrators of child sexual abuse." The State responds that the testimony challenged by the Defendant "did not constitute proof suggesting the Defendant exhibited behavior typical of child predators or propensity evidence." Furthermore, the State contends that this issue is waived because the Defendant failed to object to the comment in question and that the Defendant has failed to demonstrate plain error. We agree with the State.

The following testimony during defense counsel's cross-examination of the victim at trial gave rise to the Defendant's argument on appeal:

Q: And you never saw anything strange happen between [the victim] and [the Defendant]?

A: Yes, I would say that [the Defendant] was very friendly with children. He would buy them candy.

The following colloquy occurred during the State's redirect examination of the victim's father:

Q: [J.F.A.C.], [defense counsel] asked you about . . . the situation with her about the [D]efendant being friendly with the children of the church?

A: Yes.

Q: And did the – to you knowledge did the children of the church like the defendant?

-22-

A:  On, yes.  He would walk into the church, the children [would] follow him.

Q:  You told us . . . that he would give them candy –

At this point, counsel for the Defendant requested a bench conference out of hearing of the jury.  Counsel for the State explained that he was asking the victim's father to clarify what he was talking about when he stated that the Defendant gave the kids candy.  Defense counsel responded that there was nothing to clarify about the statement but failed to make an objection or request the court strike the statement.  The prosecutor did not ask the witness anymore questions regarding the Defendant's giving the children candy.

Although the issue was raised by the Defendant on appeal, any error was unattended by a contemporaneous objection at trial.  See Tenn. R. Evid. 103 (stating that a timely objection "stating the specific ground of objection" is necessary to preserve claim of erroneous admission of evidence); see also State v. Robert Simerly, No. E2002-02626-CCA-R3-CD, 2004 WL 443294, at *5 (Tenn. Crim. App. Mar. 11, 2004).  Accordingly, the Defendant has waived our consideration of this claim.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  It is thus reviewable only for plain error.  See Tenn. R. App. P. 36(b) (stating that this court may notice an error as plain error if the error affected the substantial rights of an accused and if notice of the error is necessary to do substantial justice).

In determining whether plain error review is appropriate, the following factors must be established:

(a) the record ... clearly establish[es] what occurred in the trial court;

(b) a clear and unequivocal rule of law [has] been breached;

(c) a substantial right of the accused [has] been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994)).  On appeal, the defendant has the burden of establishing that these five factors are met.  State v. Gomez, 239 S.W.3d 733, 737 (Tenn.

-23-

2007) (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

Here, a witness testified that the Defendant "gave all the kids candy." This statement was in response to a question by defense counsel during cross-examination. On redirect, the witness was asked to clarify, and following a bench conference, was not asked anymore questions about candy. We note that the effect of giving children candy is not necessarily indicative of sexual predators. Thus, the Defendant has failed to show that a clear and unequivocal rule of law has been breached. Moreover, the Defendant has failed to show that a substantial right of the accused has been breached. The comment was not overly prejudicial, and the State used it to help establish the Defendant's relationship with the victim. Therefore, he is not entitled to plain error relief.

### III. Closing Argument

The Defendant argues that he is entitled to a new trial due to prosecutorial misconduct during closing argument. Specifically, he argues that the State committed prosecutorial misconduct when "the prosecutor improperly argued matters outside the record, speculating that the [D]efendant's motivation for having a sexual encounter with a child was to avoid 'strings' that come with adult relationships." The Defendant also contends that the prosecutor "effectively shifted the burden of proof to the [D]efendant, arguing that 'the [D]efendant is the reason that everyone had to come into this courtroom.'" The State responds that the prosecutor's comments during closing argument did not constitute misconduct. We agree with the State.

The prosecutor's specific comments to which the Defendant objects occurred during closing argument and are as follows:

> And of the [J.F.A.C.'s] questions [during the recorded phone call] – one of [J.F.A.C.'s] questions is very relevant to your analysis. He say [Defendant], please have the courage to tell me why. Why, [Defendant], having older women and older men, why [Defendant], why have you done that to my son.

> And the answer to that question is in the question. Because the answer is the [D]efendant did this [to] [J.F.A.C.'s] son because [the victim] is not an older man or an older woman. Because what comes with older women or older men? What comes with that? Strings. He didn't want to have a relationship.

> . . . .

-24-

This phone call tells you everything you need to know. You had enough when you had the child statement alone, you had the testimony from the child. You've had more than enough proof in this case, but this is all you need to know. [The victim] was an [eleven]-year-old child. [The victim] had something taken from him that he can never get back. The [D]efendant is the reason that everyone had to come into this courtroom.

Defense counsel specifically objected to each of the previously referenced statements by the prosecutor, but the trial court overruled these objections.

Our supreme court has consistently opined on prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012).

The court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing United States v. Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164

S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005).

As explained by our supreme court in Sexton, there are five general areas of potential prosecutorial misconduct related to closing argument:

> (1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant. (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Sexton, 368 S.W.3d at 419 (citing Goltz, 111 S.W.3d at 6 (citations omitted)); see also American Bar Association, Standards Relating to the Prosecution Function and the Defense Function §§ 5 .8-5.9 (1970).

During closing arguments in this case, the State relied on facts entered into evidence. During the recorded phone call with the Defendant, the victim's father asked the Defendant, "Why [Defendant] having older women and older men? . . . Why have you done this to my son?" A transcript of this statement was entered into evidence without objection from the Defendant; therefore, the prosecutor did not argue facts outside the record. The prosecutor's inference regarding why the Defendant sexually assaulted the victim was not unreasonable. Furthermore, the trial court had instructed the jury that "statements, arguments and remarks of counsel . . . are not evidence." Additionally, the Defendant has failed to show that the comment "the reason that everyone had to come into this courtroom[]" shifted the burden of proof to the Defendant. The victim identified the Defendant as the man who sexually assaulted him, and the State had the burden of proving beyond a reasonable doubt that the Defendant was the perpetrator. This statement did not change or shift that burden. The prosecutor's comments do not constitute misconduct; thus, the Defendant is not entitled to relief on this issue.

*IV. Jury Instruction*

-26-

The Defendant argues that the trial court erred in instructing the jury on aggravated sexual battery as a lesser-included offense of rape of a child under Tennessee Code Annotated section 39-13-522. He argues that aggravated sexual battery is not a lesser-included offense of rape of a child "because it contains two different elements." The Defendant also argues that aggravated sexual battery is not a statutory lesser-included offense of rape of a child under Tennessee Code Annotated section 40-18-110 "because it was not specified as such at the time of the offense in this case, and part (b) of the test outlined in State v. Burns, 6 S.W.3d 453 (Tenn. 1999), did not survive the 2009 amendments to section 40-18-110." The State responds that the trial court properly instructed the jury on aggravated sexual battery as a lesser-included offense of rape of a child. We agree with the State.

Our Supreme Court specifically addressed this issue in State v. Howard, 504 S.W.3d 260, 263 (Tenn. 2016) and held that "aggravated sexual battery is, in fact, a lesser-included offense of rape of a child." In State v. Burns, our Supreme Court "set forth the test for determining whether a criminal offense constitutes a lesser-included offense of a charged offense[.]" Id. at 263. This court explained that under the test articulated in Burns, an offense is lesser-included if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
> (c) it consists of
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

See Burns, 6 S.W.3d at 466-67.

The 2009 amendments to Tennessee Code Annotated "codified <u>Burns</u> parts (a) and (c) but excluded part (b)." <u>Howard</u>, 504 S.W.3d at 264. However, despite the exclusion, the court held that "the statute did not abrogate part (b) of the <u>Burns</u> test." <u>Id.</u> The court explained that "[l]esser-included offenses are to be determined by referring to the express provisions of [Tennessee Code Annotated section 40-18-110], and if not specifically mentioned therein, by further applying the guidance of <u>Burns</u> part (b)." <u>Id.</u> at 263-64. The <u>Howard</u> court analyzed the issue as follows:

> "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." <u>Id.</u> § 39-13-501(7). As applicable to this case, a defendant commits the offense of aggravated sexual battery when he or she engages in "unlawful sexual contact with a victim" and "[t]he victim is less than thirteen (13) years of age." <u>Id.</u> § 39-13-504(a)(4). The statutory definition of "sexual contact" contemplates that the "intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." <u>Id.</u> § 39-13-501(6).
>
> The primary difference between the two criminal offenses is that rape of a child requires "unlawful sexual penetration," while aggravated sexual battery is accomplished by "unlawful sexual contact." Because aggravated sexual battery requires that the touching be reasonably construed as being for the purpose of sexual arousal or gratification, which is not an element of child rape, it cannot be considered a lesser-included offense in this case under <u>Burns</u> part (a).
>
> Pursuant to <u>Burns</u> part (b), however, unlawful sexual contact involves a less serious risk of harm to the person, <u>Burns</u>, 6 S.W.3d at 466-67, and a defendant's "intent to touch a victim's intimate parts for the purpose of sexual arousal constitutes a mental state reflecting a lesser degree of culpability than the reckless, knowing, or intentional commission of sexual penetration for any reason," State v. Greer, No. M1998-00789-CCA-R3-CD, 2000 WL 284180, at *7 (Tenn. Crim. App. Mar. 17, 2000). Accordingly, we hold that aggravated sexual battery is a lesser-included offense under part (b) of the <u>Burns</u> test and that the trial court properly instructed the jury as to this offense.

-28-

Howard, 504 S.W.3d at 274-75.

Accordingly, aggravated sexual battery is a lesser-included offense of rape of a child. Thus, the Defendant is not entitled to relief on this issue.

## V. Length of Sentence

The Defendant contends that his sentence of eleven years' confinement at one hundred percent was excessive. Specifically, he argues that the trial court erred in determining that he had a prior history of criminal behavior under Tennessee Code Annotated section 40-35-114(1) and that the trial court failed to "recognize his positive work and family history as a statutory mitigating factor under" Tennessee Code Annotated section 40-35-113(13). The Defendant also argues that his sentence is "greater than that deserved for the offense committed" and "is not the least severe sentence necessary to achieve the purposes for which the sentence is imposed" in violation of Tennessee Code Annotated sections 40-35-103(2) and (4). The State responds that the Defendant's sentence was proper because it was "within the applicable range of punishment and the trial court's reasons are supported by the proof and consistent with the purposes and principles of sentencing." We agree with the State.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the pruposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Thus, before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion

standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

In determining the Defendant's sentence, the trial court reasoned as follows:

The Court recalls this trial and looking back through my notes regarding the testimony there and heard the testimony here today, [I am aware] of the purposes for sentencing, sentencing considerations under 40-35-102 and 103, some of them have been – some of those statutory laws have been mentioned here today.

. . . .

In terms of enhancing factors, the court does find that some apply. In terms of – there is no question in the court's mind that the abuse – that [the Defendant] abused a position of trust applies. I mean, the incident that we are talking about occurred at the family's and [the Defendant's] church. I don't know what position he holds in terms of whether that's some elected, nominated position, but he does have a position in the church in terms of driving the individuals[,] including children[,] on trips. But . . . the enhancing factor doesn't require that he be in some elected position. It just requires that that position of trust there where this incident occurred has him, [the Defendant's] exercising authority in this trusted place. A place where most people would think there is safety involved. He, [the Defendant] only comes into – only has the ability to be around the victim because of that trusted, safe place, that church, that relationship that exists between [the Defendant] and the young child here, which . . . [led] him, [the Defendant] to be instructing or ordering [the victim] around and doing things for him on that particular occasion which [led] to them being at a location where other[s] were not around. So that enhancing factor is present and the [c]ourt places significant weight on it.

In terms of the criminal behavior, thankfully, we are not talking about other acts of rape of a child or significant trauma perpetrated on this young child but I think the [c]ourt can consider the fact that [the

-30-

Defendant], according to this young child, has initiated contact, sexual contact with him in the past.

In terms of the notice, I mean, [the Defendant] is aware of, and the attorneys are well aware . . . that was an allegation. I mean, we addressed it in terms of redactions from the medical records and the phone call transcript, so yes he's aware that this young child has made claims that this – not as sever[e], but conduct like this has occurred in the past. And obviously that can be brought up at a sentencing hearing, but not before the jury, so I don't think there is any due process violations in terms of notice.

I mean . . . [the Defendant] references the Kansas trip in the phone call and makes accusations against a young child about touching him [on] multiple occasion[s], some of which was on that particular Kansas trip. And those accusations also were in and around the referenced vigil, this special church outing that was occurring in the situation where the jury heard. I mean, [the victim] makes references of [the Defendant's] touching him under the table many times and references Kansas prior that that as well. So, like I said it's not some situation where multiple prior acts of child rape have occurred, it's a situation where [the Defendant], for whatever reason has made advances towards this young child and then it [led], according to the jury, to the aggravated sexual battery that they heard about.

So [the Defendant] here, . . . could have been questioned more than he was[] about the prior accusations that [the vicitm] is making, and there has been nothing to contradict it submitted proof wise. And like I said, [the Defendant] mentions that situation [during] the phone conversations with the young child's father. So those enhancing factors apply.

In terms of mitigating – and the State was arguing that [the Defendant] did not accept responsibility. I have [mentioned], there is no enhancing factor that the Court [is] aware of that . . . I can consider or enhance a sentence because a defendant did not accept repsonsibility . . . . But that's not applicable here because [the Defendant] is not arguing that that's a mitigating factor because he [has] not acknowledged anything in terms of [a] statement he's made in the presentence report. There were some statements made as I mentioned in a phone call in terms of taking repsonsibility but it didn't arise to penetration, didn't go that far, understands that, but that's not [an] enhancing factor nor do I find it's a mitigating factor under the catchall provisions and further I don't find that any other mitigating factors apply.

So based on that and the statutes the Court's mentioned previously, the [c]ourt will impose an [eleven-]year sentence at [one hundred] percent to serve with the statutory requriements upon his release.

In this case, we hold that the trial court did not abuse its discretion in applying enhancement factor number one, "the defendant has a previous history of . . . criminal behavior." Tenn Code Ann. § 40-35-114(1). The victim testified at the sentencing hearing that he attended church trips with the Defendant and that on one of these trips, the Defendant touched him in such a way that made him uncomfortable. The trial court also referenced several such accusations by the vicitm in the recorded phone call and his medical records. At the hearing, the Defendant put on no proof that these allegations were false. Additionally, the Defendant does not question the trial court's application of enhancement factor number fourteen, "the defendant abused a position of public or private trust." Tenn Code Ann. § 40-35-114(14). The trial court, as was its perogative, declined to take into account any of the Defendant's mitigating evidence such as his work history and "family history." The Defendant has failed to show that the sentence was improper, and he is not entitled to relief on this issue.

## VI. Cumulative Error

Finally, the Defendant argues that cumulative errors committed during his trial entitle him to a new trial on all charges.[2] Under the cumulative error doctrine, our supreme court has stated,

> [T]here may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). Therefore, necessarily, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the proceedings." Id.

Here, there was not "more than one actual error committed in the proceedings." See Hester, 324 S.W.3d at 76. Accordingly, we hold that the Defendant is not entitled to relief on the basis of cumulative error.

---

[2] We note that the Defendant does not raise cumulative error as a separate, sixth issue. Rather, he includes this as part of his argument regarding prosecutorial misconduct.

## CONCLUSION

Based upon consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE